THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v. MARTIN GOLDSTEIN and HARRY STRAUSS, Appellants.

Argued March 14, 1941; decided April 24, 1941.

*I. Maurice Wormser, Conrad H. Ratner, Emanuel Rosenberg* and *Herman Reich* for Martin Goldstein, appellant.

*Daniel H. Prior, Harry G. Anderson* and *Samuel Bader* for Harry Strauss, appellant

*William O'Dwyer, District Attorney* (*Solomon A. Klein, Henry J. Walsh* and *Burton B. Turkus* of counsel), for respondent.

LEWIS, J.   Shortly before midnight of September 4, 1939, a woman living near the intersection of Filmore avenue and East Fifty-second street in the borough of Brooklyn ventured out to investigate the source of a high flame which she had observed mounting from a vacant lot adjacent to her home. When she had partly extinguished the fire from which the flame arose she saw a human head emerge from charred wrappings.   The body was that of Irving Feinstein who had met his death in a manner which later gave rise to the present criminal action.

The two appellants, Martin Goldstein and Harry Strauss, now stand convicted of murder in the first, degree upon an indictment which charged that they " wilfully, feloniously and of malice aforethought, killed Irving Feinstein, by strangling him with a rope, and setting fire to his body."

An important factor in the People's case was the testimony of Abraham Reles, concededly an accomplice, who, as a witness for the prosecution, described a sequence of events in which the defendants participated and which led to the homicide.

Asserting upon this appeal that they were deprived of a fair trial, the defendants challenge instructions given to the jury by the trial judge which related to the statutory requirement that conviction could not be had upon the testimony of the accomplice Reles or of any other accomplice unless there was corroboration by such other evidence as tended to connect the defendant with the commission of the crime. Reference to the testimony given by Reles and by other witnesses will serve to make clear our problem.

For several weeks prior to the homicide Reles and the two defendants had been in search of " Puggie " (Irving) Feinstein who was not then personally known to them. Their search had been set in motion by one Albert Anastasio whom they recognized as their " boss " and who had given Strauss " A contract to *take* * * * ' Puggie ' " who, they were told, " comes from Borough Park and 14th Avenue."   During the evening of September 4, 1939, Reles, Goldstein and Strauss met near their " hang-out " at the corner of Saratoga and Livonia avenues in Brooklyn and, while talking together, were approached by a stranger who inquired where he could find " Tiny."   As he walked away, without the information which he sought, Strauss asked him, " Who should I say was here? "   To this the stranger replied, " You tell him ' Puggy ' from Borough Park and 14th Avenue."   This surprising response was enough to inform the defendants and Reles that their search was at an end —" Puggy " Feinstein was there within their reach. It was in these circumstances that Strauss suggested to Feinstein that he would help him find his friend " Tiny." While Feinstein left the group to inform friends in his car that they should wait for him, the defendants and Reles quickly made plans by which Feinstein was to be driven about town for an hour by the defendant Goldstein in a

pretended search for " Tiny " and eventually was to be brought to the home of Reles. Meantime Reles would go directly to his home to prepare to receive Feinstein while Strauss went to the home of Anastasio to " ask if it is O. K. to *take* him off the corner." Plans then made were carried out in detail. Strauss went to Anastasio and returned to the Reles house with the report that " Albert said O. K., to do it clean." Meanwhile the defendant Goldstein, in a car owned and driven by the witness Maffetore — who had happened to be standing near the group and was asked to lend the use of his car — accompanied Feinstein by a circuitous route to the home of Reles where Strauss and Reles had been making preparations for his reception. Reles had awakened his mother-in-law, the witness Mrs. Kirsch, from whom he inquired and was informed as to where a rope and an ice pick could be found. They then returned to the living room where they turned on the radio to muffle any noise which might ensue and arranged themselves by stationing Strauss at one side of the entrance door, with a rope and ice pick beside him, and Reles on the opposite side of the room. Soon Goldstein and Maffetore arrived at the Reles house with Feinstein who had been told that his friend " Tiny " was there. As Feinstein entered and advanced into the living room Strauss sprang upon him. In the melee which followed the efforts of Reles, Goldstein and Strauss were required to overcome the stranger's resistance. Finally, however, the struggle was at an end and by the combined efforts of Reles and both defendants a rope was knotted about their victim's neck and his knees were bound to his chest. At this point the defendant Strauss suggested that the body should be burned to avoid detection. To that end and upon instructions from Strauss the defendant Goldstein took from Maffetore — who, it is claimed was standing at or near the entrance door — the keys to Maffetore's car and drove away to secure gasoline. When Goldstein returned Strauss said to him, " You take him [Feinstein's body] down the dumps, down on Flatlands Avenue and Ralph. While you are

putting the match to him nobody will know the difference, the dumps are always burning." Reles then backed the Maffetore car into the driveway to a point opposite a side entrance and, with the aid of Strauss, he placed the body on the floor of the tonneau. As Goldstein entered the tonneau and seated himself in a position to shield the body, Maffetore took the driver's seat and the car moved out to the street and away. The course taken by the car was according to directions given by Goldstein who finally ordered it to a stop. He then rolled the roped body out of the car and into a lot where he poured gasoline on it and set it afire. Having thus started what is described as "a big blaze" Goldstein returned quickly to the car and directed Maffetore to drive fast. As they reached the intersection of Saratoga and Livonia avenues they nearly collided with a car driven by the witness Seymour Magoon who was a friend of Goldstein. When the two cars stopped Goldstein left the Maffetore car and, taking with him the empty can in which he had purchased the gasoline, he entered the Magoon car. After telling Magoon what had transpired Goldstein asked him to drive to the gasoline filling station where he would return the can and pay for the gasoline. Magoon advised against the return of the can, suggesting that " It may have finger prints on it." However, he drove Goldstein to the gasoline station where the attendant — the People's witness Arent — was paid one dollar. Goldstein did not return the can but told Arent it had been lost. Later it was wiped off with a handkerchief and thrown out upon a pile of rubbish at the side of a street along which the car passed as it returned to the corner of Saratoga and Livonia avenues where Goldstein had joined Magoon. There Goldstein met Strauss who, at the close of a conversation, handed him thirty dollars.

The jury which has convicted the defendants learned of these events from testimony of the accomplice Reles — who admitted he had perjured himself in another trial and that he had participated in other murders; from Maffetore and Magoon — each of whom, as the evidence shows and

the trial judge charged, bears a sinister record in crime; and from the witnesses Arent and Mrs. Kirsch. It was thus made as obvious to the jury upon the trial as it is to us upon this appeal that the testimony of Reles, Maffetore and Magoon, upon essential phases of the case, was from polluted sources.

The criminal tendencies of these three witnesses — which the jury may have treated as facts which " are but a warning that caution should be used " in valuing their testimony (*People* v. *Cohen*, 223 N. Y. 406, 422; *People* v. *Seidenschner*, 210 N. Y. 341, 358) — have caused us to consider the charge with scrupulous care. (*People* v. *Katz*, 209 N. Y. 311, 336; *People* v. *Becker*, 215 N. Y. 126, 140; *People* v. *Cohen, supra*, p. 412; *People* v. *Crum*, 272 N. Y. 348, 353. See, also, 7 Wigmore on Evidence [3d ed.], § 2058.) The added fact that no witness was called by the defendants to disprove their connection with the crime, makes it of utmost importance, in justice to their rights, that the jury was instructed as to the corroboration which the law requires of an accomplice.

That requirement has taken the form of a statutory mandate — " A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime." (Code Crim. Proc. § 399.)

The statute is not satisfied if the corroborative testimony tends only to establish the credibility of the accomplice. " The corroborative evidence to have any value must be evidence from an independent source of some material fact tending to show that defendant was implicated in the crime. * * * The *independent* evidence must be material evidence *other* than that of the accomplice and must fairly and reasonably *tend to connect the defendant with the commission of the crime.* * * * It may not depend for its weight and probative value upon the testimony of the accomplice. It need not, alone and by itself, establish that defendant committed the crime. But where the corroborative evidence standing alone has no *real* tendency to connect

defendant with the commission of the crime, it is insufficient." (*People* v. *Kress*, 284 N. Y. 452, 460; *People* v. *Maione*, 284 N. Y. 423, 425; *People* v. *Feolo*, 284 N. Y. 381, 386, 388; *People* v. *Reddy*, 261 N. Y. 479, 484; *People* v. *Dixon*, 231 N. Y. 111, 116.)

We are to determine whether the jury was instructed as to the clear mandate of the statute and its legal requirements as interpreted by the rulings cited above. Upon such inquiry, " The test is always whether the jury, hearing the whole charge, would gather from its language the correct rules which should be applied in arriving at decision." (*People* v. *Russell*, 266 N. Y. 147, 153; *People* v. *Johnson*, 185 N. Y. 219, 232.)

After quoting to the jury *verbatim* the language of section 399 of the Code of Criminal Procedure, the trial judge charged: " That does not mean that there has to be independent proof of every essential element in the crime. That means two things: *first*, there must be proof that the crime has been committed, from an independent source, and *second*, there must be proof of some fact which ties the defendant in in such a way that it will convince you that the accomplice was telling the truth." At another point, after a recital of the long criminal record of the accomplice Reles, as bearing upon the weight which the jury should give to his testimony, the charge continued: " If you find other testimony in the case from independent sources corroborates different steps as related by him [Reles], connecting the defendants with the crime, if that satisfies you he was telling the truth, it is for you to decide."

Although the appellants may point to minor inaccuracies in these and other statements in the charge upon the rules of law governing the corroboration of an accomplice, we do not think, when the charge as a whole is considered, that the jury was either misled or confused as to the rules which should govern their deliberations upon that branch of the case. (*People* v. *Russell*, *supra*, p. 153.) In reaching that conclusion we are influenced by one of the last instructions to the jury given by the trial judge when, upon

request made on behalf of both defendants, he charged " that even if the jury believes the testimony of the witness Reles they cannot convict on his testimony unless it is corroborated by other independent, believable evidence tending to connect the defendant with the commission of the crime." The accuracy and clarity of that statement of law has not been criticised. It finds full support in our recent ruling in *People* v. *Kress* (*supra,* p. 460).

Both defendants have challenged the propriety of the charge in other particulars. On behalf of the defendant Strauss the additional argument is made that he was deprived of his constitutional rights by being forced to trial without being afforded a judicial inquiry as to his ability either to comprehend the charges against him, or to confer with counsel and to make his defense. We have examined the record with care and have considered the errors thus assigned.

Finding that the substantial rights of each defendant were protected at the trial, we conclude the judgments of conviction should be affirmed.

CONWAY, J. (concurring). I concur in all that Judge LEWIS has written. I go further, however.

In the portion of the charge quoted in the dissenting opinion, the court called the attention of the jury to the facts and circumstances of the case. He spoke of corroboration but at some point ceased speaking of it in order to go on to the facts. That much is clear. Where did the court cease discussing corroboration in that portion of the charge? That is the question.

The court said: " That means two things: *first,* there must be proof that the crime has been committed, from an independent source, and *second,* there must be proof of some fact which ties the defendant in in such a way that it will convince you that the accomplice was telling the truth. It does not have to be overwhelming, but if there is proof from independent sources of different steps which show you that Reles was telling the truth, and you believe his story, it is enough." (End of that portion of the charge on corroboration; beginning of charge on facts.)

" Whatever human witnesses may do as to stating what did or did not happen, whatever lapses of memory there may be on the part of human witnesses, there are certain physical *facts* which cannot be altered, cannot be changed. *The first fact in this case is* the condition of the body when found burning in the lot. You have pictures of it, how this body was trussed up and tied, to correspond with the tale as to what was done to Feinstein that night. That is a physical *fact.* *Then* you have other *testimony.* You have the *testimony of Maffetore.* Maffetore said he was at the corner with his car and *Goldstein came over* and told him, ' Get that guy,' indicating somebody, ' into your car,' and as it turned out to be Feinstein, got into his car and Goldstein told him, ' Drive him to Tiny's house.' He said he knew where Tiny lived, and he drove to his house, *Goldstein got out* and he was out a couple of minutes, and came back and said, ' He is not in,' to drive to Reles' house. He said he didn't know where it was. He said, ' I'll tell you; drive the way I tell you,' and he drove to Reles' house. When they got there, *Goldstein got out,* went in the house, came out and said, ' Come on in,' and the three of them went in the house, *Goldstein, Feinstein, and Maffetore,* in that order." (Fols. 1887–1890.) (Paragraphing, italicizing and insertion in parenthesis are mine.)

In the new paragraph, as made by me, there is nothing about Reles or corroboration. The word " then," as underscored, connects what precedes in the same paragraph with what follows. The portions italicized have no relation to a charge as to corroboration of Reles. That is self-evident. Somewhere, therefore, in those sentences the court passed from the question of corroboration to a treatment of the facts generally. It is clear to me that it occurred at the sentence commencing with the words: " Whatever human witnesses * * *."

If the court reporter had paragraphed this portion of the charge as I have, it would have been clearer, but the paragraphing of a court reporter has not finality. I think there is a misreading of a sentence and a separation of it from its proper context.

LOUGHRAN, J. (dissenting). Respecting the People's accomplice-witness Reles, the trial judge in his charge to the jury said: " Reles, as a matter of law, is an accomplice, and on his testimony alone there cannot be any conviction. You have heard a lot in this case about accomplices and corroboration, what is this and what is that? Now I will tell you what the law is. The statute says, ' A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime.' That does not mean that there has to be independent proof of every essential element in the crime. That means two things: *first*, there must be proof that the crime has been committed, from an independent source, and *second*, there must be proof of some fact which ties the defendant in in such a way that it will convince you that the accomplice was telling the truth. It does not have to be overwhelming, but if there is proof from independent sources of different steps which show you that Reles was telling the truth, and you believe his story, it is enough. Whatever human witnesses may do as to stating what did or did not happen, whatever lapses of memory there may be on the part of human witnesses, there are certain physical facts which cannot be altered, cannot be changed. The first fact in this case is the condition of the body when found burning in the lot. You have pictures of it, how this body was trussed up and tied, to correspond with the tale as to what was done to Feinstein that night. That is a physical fact.."

I believe that these forthright sentences would denote to the mind of the average person the idea that the condition of the body of the murdered man (Feinstein) was a physical fact which in itself — irrespective of the quality of the testimony of the human witnesses — was in law sufficient support for the " tale " of Reles. The trial judge, as I believe, said and intended to say that evidence in corroboration of an accomplice is legally sufficient when it shows to the jury that the accomplice told the truth

and that, therefore, it is enough that his testimony correspond with the unalterable and unchangeable physical facts of the crime charged.

If this was the meaning of the charge, then these judgments of conviction cannot stand.

Under the law of this State, the test of the sufficiency of evidence adduced in confirmation of an accomplice is that it shall tend in some degree to connect an identifiable person with the commission of the crime. (*People* v. *Feolo,* 284 N. Y. 381; *People* v. *Kress,* 284 N. Y. 452.) In fact we have specifically held that evidence which merely shows that the crime was committed in the fashion described by an accomplice is not such corroboration of his testimony as is required by the statute. (Code Crim. Proc. § 399; *People* v. *Maione,* 284 N. Y. 423.) Even so, this court now finds only " minor inaccuracies " in the foregoing words of the charge. The cases I have just cited are cited in the prevailing opinion to sustain the conclusion of the court that " the jury, hearing the whole charge, would gather from its language the correct rules which should be applied in arriving at decision."

" In reaching that conclusion," say the court, " we are influenced by one of the last instructions to the jury given by the trial judge, when, upon request made on behalf of both defendants, he charged — ' that even if the jury believes the testimony of the witness Reles they cannot convict on his testimony unless it is corroborated by other independent, believable evidence tending to connect the defendant with the commission of the crime.' " The court is impressed by " the accuracy and clarity of that statement of the law." But that statement must be taken to have been qualified by the earlier and more colorful words of the trial judge which I first put down above — unless indeed we are to ignore the repeated admonition in the prevailing opinion that the charge is to be read as a whole. More than that, this last quoted single conventional sentence of the trial judge (which has so much influenced this court) was a mere paraphrase of the statute (Code Crim. Proc. § 399).

In truth, that sentence added little to the charge. "The better practice for the court in a criminal case, emphatically in a capital case, even when uninvited by the defendant, is to present to the jury the case on trial in all the phases in which the jury ought to consider it. * * * The trial judge should not as a rule limit himself to stating good set terms of law culled from the codes and the reports. Jurors need not legal definitions merely. They require proper instructions as to the method of applying such definitions after reaching their conclusions on the facts." (POUND, J., in *People* v. *Odell*, 230 N. Y. 481, 488.)

So we come back to the instructions of the trial judge which are first set out in this opinion. The jury actually had nothing else to go by in appraising the value of the testimony of Reles. These instructions are simple combinations of normal English words. Yet the difference that now divides this court is one in respect of the ordinary meaning thereof. The majority say that the trial judge thereby gave expression to the proposition that, "The statute is not satisfied if the corroborative testimony tends only to establish the credibility of the accomplice." To my mind, the words of the trial judge say quite the contrary. I can only add that the jury's understanding of any connotation of those words is beyond our finding out.

But the ultimate question in this case is not a question of rhetoric. The ultimate question is one that goes to fundamentals of the fair administration of the criminal law. "If trial by jury is to be maintained, the right of every accused person to be tried in accordance with established forms of law must be respected." (*People* v. *Marendi*, 213 N. Y. 600, 619.) It is to be said for the trial judge that high authorities in other places would sanction his charge as I have read it. (7 Wigmore on Evidence [3d ed.], § 2059, p. 327.) When so read, however, it is opposed to the settled construction of the statute which in this State regulates the sufficiency of proof required to support the testimony of an accomplice. The reason of the statute is this: "A man who has been guilty of a crime himself will always be able to relate the facts of the case, and if the confirmation be only on the

truth of that history, without identifying the person, that is really no corroboration at all." (See *People* v. *Feolo, supra,* at p. 388.)

I believe that the charge of the trial judge cannot fairly be reconciled with this principle and that in consequence the defendants did not have a legal trial. Accordingly, I vote to reverse the judgments of conviction and to grant a new trial.

LEHMAN, Ch. J., and FINCH, J., concur with LEWIS, J.; CONWAY, J., concurs in separate opinion in which FINCH, J., concurs; LOUGHRAN, J., dissents in opinion in which RIPPEY and DESMOND, JJ., concur.

Judgments of conviction affirmed.